

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-22-00442-CV

———————————————

IN THE INTEREST OF K.A., M.A., AND P.G., CHILDREN

---

On Appeal from the 360th District Court
Tarrant County, Texas
Trial Court No. 360-699440-21

---

Before Birdwell, Bassel, and Womack, JJ.
Memorandum Opinion by Justice Bassel

# MEMORANDUM OPINION

## I. Introduction

This is an ultra-accelerated appeal[1] in which Appellant R.V. (Mother) appeals the termination of her parental rights to three of her children—Kyle,[2] Mindy, and Peter[3]—following a bench trial and in-chambers interviews with Kyle and Mindy. Mother's brief fails to include an "issues presented" section or to specify what issues she raises on appeal. Parsing through the argument section in her brief, she appears to challenge (1) the sufficiency of the evidence regarding her compliance with her court-ordered service plan and (2) the sufficiency of the evidence to support the trial court's best-interest finding. Mother's first argument fails because the trial court did not terminate her parental rights based on the service-plan predicate ground. Her second argument likewise fails because the record contains sufficient evidence to support the trial court's best-interest finding. Accordingly, we affirm.

---

[1]*See* Tex. R. Jud. Admin. 6.2(a), *reprinted in* Tex. Gov't Code Ann., tit. 2, subtit. F app. (requiring appellate court to dispose of appeal from a judgment terminating parental rights, so far as reasonably possible, within 180 days after notice of appeal is filed).

[2]*See* Tex. R. App. P. 9.8(b)(2) (requiring court to use aliases to refer to minors in an appeal from a judgment terminating parental rights). All of Mother's children, no matter their ages, are referred to using aliases.

[3]A fourth child, Emily, was removed with the three listed children, but she was nineteen years old at the time of the trial and, "for the purposes of this case, is not a child [who is the] subject of this suit." A fifth child, Aaron, was sixteen years old and lived in Austin with his father at the time of the removal but had lived with Mother and his siblings in prior years.

## II.  Background

### A.  Life in the Home

At the time of the children's removal, Emily was seventeen, Kyle was fourteen, Mindy was twelve, and Peter was four.  They lived with Mother, Mother's boyfriend Victor, and Victor's brother.  To illustrate why it was necessary for the Department of Family and Protective Services to remove the children from the home and why they could not be returned to Mother's care, we set forth a sampling of what the children had endured before their removal, including neglect; physical and sexual abuse; labor trafficking; and exposure to drugs, domestic violence, and prostitution:

- The children said they would go days without food and that Victor would not let people take them out to eat or bring them food.  Emily said that if they did have food, Victor ate first and only gave them a little.

- All five kids (including Aaron when he had lived with them) slept on blankets on the floor in the same bedroom while Mother and Victor slept in the other bedroom on a "[v]ery comfortable" bed.

- The children said that Mother had physically abused them by hitting them (with anything that she could find), throwing things at them, and withholding food from them.

- Emily was physically abused by a couple of Mother's boyfriends and by Mother.  On one occasion when Mother was mad because a paramour had left, she beat Emily until she was bloody and then wiped the blood off the floor with Emily's face.  Mindy described a similar beating during which Mother had used Mindy's head to wipe up blood from the floor.

- Peter said that Mother had punished him for misbehaving by punching his head.

- Emily, Mindy, and Kyle were sexually abused by Aaron.

- Kyle, despite being only fourteen, was not in school; instead, Victor had prepared fake documents and had gotten him a job at a golf cart store. Kyle worked 8:00 a.m. to 1:00 p.m. five days per week to pay the bills and support the household. Kyle said that he often used his money to buy pizza for himself and his siblings on the weekends.

- Emily and Mindy told the caseworker that Victor had packaged cocaine on the kitchen table and that they were forced to clean up the table afterwards. Additionally, the girls testified that Victor had required Kyle to deliver cocaine.

- Emily said that Mother's boyfriends and the children's fathers[4] had abused Mother. Mother had multiple miscarriages due to the domestic violence inflicted on her by Victor and her other boyfriends, and she instructed the girls to clean up the miscarriages and dispose of the babies' remains in the trash or put them in a Ziploc bag in the freezer.

- The children witnessed an occasion when Mother tied up Peter's dad with a rope, connected it to her vehicle, and dragged him around the apartment complex.

- Emily believed that Mother had engaged in prostitution because men came to the home, gave her money, and went into the bedroom with her. Emily also told her therapist about "the Chicken Man," who brought fried chicken to the home to occupy Emily and Mindy while he had sexual relations with Mother. At first, the food was used to keep the girls away from the bedroom. And then at some point, he started using the food as a bribe to inappropriately touch the girls; he grabbed their rear ends or touched their vaginas or put his hands uncomfortably high on their legs or grazed their breasts. Emily testified that he had touched her vagina and her anus inside her pants and her breasts for six months to one year when she was eight or nine years old. Emily told Mother about the touching, but instead of calling the police, Mother blackmailed the man for money. Mindy also testified about Mother's prostitution, stating that Mother had made them sleep in the car when she had gone to homes or hotels to prostitute herself.

---

[4]Emily, Kyle, and Mindy shared the same father; Peter had a separate father; and Aaron had a separate father.

4

The children's permanency specialist said that there were a lot more "horrible things" that had happened to the children than even she or the therapist had testified to.

## B.    The Removal

The key events that preceded the children's removal started on or about April 23, 2021.  On that day, Mother called the police after Victor pushed Mindy and left a red mark on her chest.  Victor left in his truck before the police arrived.

Three days later, Victor returned to the home at 5:00 a.m., picked up Mother, and left.  The children (as well as Mother) were fearful that Mother would be killed by Victor.[5]

On the day of Mother's disappearance, the Department received an intake that reported concerns of drug use and drug selling in the home, along with domestic violence.  When the Child Protective Services (CPS) investigations supervisor and an investigator arrived at the home, no adults were present, and none arrived during the three hours that CPS was there.  When Emily finally got Mother on the phone two hours after CPS had arrived and told Mother that CPS was at the home and that they were trying to get in touch with her, Mother responded, "I'm all right," before hanging up.  She did not show any concern about why CPS was in her home and did not ask if her children were injured or how they were doing.  After separately interviewing Emily and Mindy, the case "was staffed for emergency removal due to

---

[5]Mother testified that Victor took her to a hotel so that they could have a conversation and kept her there until mid-day before taking her back home.

no adult being at the home," as well as due to concerns of active drug use and drug packaging in the home and domestic violence.

CPS took Mindy and Peter to the CPS office, and Emily went with the CPS investigator to pick up Kyle from his job at a golf cart store. After all the children were transported to Alliance for Children, the CPS investigations supervisor was finally able to speak with Mother. Mother denied all the allegations: she said that her children were lying, that there was no domestic violence or drug use in the home, and that her children just did not want her to be with her boyfriend. Despite Mother's denial of drugs in the home, four-year-old Peter tested positive for cocaine on a hair-follicle test.[6] The CPS investigations supervisor testified that she never spoke to Mother's boyfriend; he was shot and killed while the investigation was pending.

## C.   The Outcome

After hearing testimony about the above incidents, as well as evidence related to the best-interest ground,[7] the trial court rendered a judgment terminating Mother's parental rights based on the endangering-environment and endangering-conduct

_____

[6]The other children were not tested because, according to the CPS investigations supervisor, "children who are older can make their own decisions [regarding] whether or not they're going to use illegal substances."

[7]Emily's therapist, the permanency specialist, Emily, and the drafter of the CASA report opined that it was not in the children's best interest to be returned to Mother. More detailed testimony related to the best-interest ground is set forth below in the best-interest analysis.

predicate grounds, as well as the best-interest ground. Mother then perfected this appeal.

### III. Burden of Proof and Sufficiency Standards of Review

For a trial court to terminate a parent–child relationship, the Department must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *Z.N.*, 602 S.W.3d at 545.

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *Id.* The factfinder may draw inferences, but they must be reasonable and logical. *Id.* We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.*; *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable

factfinder could not. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that the Department proved that Mother endangered the children and that the termination of the parent–child relationship would be in the children's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (b)(2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

## IV. Predicate Grounds

As noted above in the introduction section, Mother argues in her brief that she completed her service plan and that the trial court should not have terminated her parental rights based on this ground. *See generally* Tex. Fam. Code Ann. § 161.001(b)(1)(O). The trial court, however, did not terminate Mother's parental rights based on a failure to complete the services on her service plan but instead terminated based on the endangering-environment and endangering-conduct

8

predicate grounds, which Mother does not challenge.[8]  Because Mother fails to challenge the endangerment predicate grounds that were found by the trial court, we need not address the sufficiency of the evidence to support them.[9]  Accordingly, we overrule Mother's argument challenging the termination order on a ground that was not found by the trial court.

## V. Best-Interest Ground

In several places in her brief, Mother mentions the best-interest ground, though she relies solely on her service-plan compliance to argue that "the best[-]interest finding required by Texas Family Code [Section] 161.001[(b)(2)] was not proven at trial."  Mother makes no mention and provides no analysis of the *Holley* factors.  *See generally Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).  Because, as

---

[8]Instead, Mother appears to implicitly concede that she had endangered her children but argues that her children should be returned to her because she completed her services.

[9]As we have previously noted when presented with a similar scenario,

> [O]ur decision to not address the sufficiency of the evidence to support the trial court's findings related to Sections 161.001(b)(1)(D) and 161.001(b)(1)(E) does not run afoul of the Supreme Court of Texas's . . . decision in *In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019) . . . . In this case, Mother does not challenge these findings, and the court in *N.G.* made it clear that its holding[—]that a reviewing court must review Sections 161.001(b)(1)(D) and 161.001(b)(1)(E) even when another statutory ground sufficiently supports termination[—]is predicated on the party's having challenged Sections 161.001(b)(1)(D) and 161.001(b)(1)(E) on appeal. *Id.*

*In re K.A.*, No. 02-19-00099-CV, 2019 WL 4309168, at *11 n.4 (Tex. App.—Fort Worth Sept. 12, 2019, pet. denied) (mem. op.).

discussed more fully below, the *Holley* factors weigh in favor of termination, we conclude that sufficient evidence supports the trial court's best-interest finding.

## A. *Holley* Factors

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). In determining whether evidence is sufficient to support a best-interest finding, we review the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). Evidence probative of a child's best interest may be the same evidence that is probative of a Subsection (b)(1) ground. *Id.* at 249; *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b)(1), (2). We also consider the evidence in light of nonexclusive factors that the factfinder may apply in determining the children's best interest:

(A)  the [children's] desires . . . ;

(B)  the [children's] emotional and physical needs[,] . . . now and in the future;

(C)  the emotional and physical danger to the child[ren] now and in the future;

(D)  the parental abilities of the individuals seeking custody;

(E)  the programs available to assist these individuals to promote the [children's] best interest . . . ;

(F)  the plans for the child[ren] by these individuals or[, if applicable,] by the agency seeking custody;

10

(G)     the stability of the home or proposed placement;

(H)     the [parent's] acts or omissions . . . indicat[ing] that the existing parent–child relationship is not a proper one; and

(I)     any excuse for the [parent's] acts or omissions.

*Holley*, 544 S.W.2d at 371–72 (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors" (footnote omitted)); *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012). These factors are not exhaustive, and some listed factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the children's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

**B.     Evidence Pertaining to and Analysis of the Best-Interest Factors**

**1.     The Children's Desires**

Emily testified that Kyle and Peter were happy in their foster home. The permanency specialist said that Kyle had told two different stories about whether he wanted to go home. The permanency specialist also said that Kyle is "torn between his past, his present, and what could be his future. And when those worlds start colliding, it . . . literally pull[s] him apart." Kyle loves Mother; he knows that she is not a good parent but is concerned about not having contact with her. The permanency specialist opined that Kyle is not mature enough to make a decision on

11

his own.[10] During Kyle's in-chamber interview, when asked whether he would like to return to Mother or stay in his foster placement, he said that he was not sure yet.

Mindy said that she was happy with her foster mom and that she felt safe.[11] Mindy told the permanency specialist that she did not want to return to Mother and had threatened to self-harm if she were returned to Mother. After Mindy's in-chambers testimony concluded, she started weeping, and the trial court put the following on the record:

> THE COURT: Are you afraid you're going to have to go back to your mom? Does that scare you?
>
> . . . .
>
> [Mindy]: Yes.
>
> THE COURT: Okay. So you're crying because you're afraid you may have to go back to your mom? Okay. That's terrifying to you?
>
> [Mindy]: Yes, ma'am.
>
> THE COURT: And it's hard -- we're on the record[,] and I just want to for the record. You look really scared. And that's what you're afraid about is having to go to your mom?
>
> [Mindy]: (Nods head.)

---

[10]Additionally, Mindy—who testified in chambers prior to Kyle—said that he is "really protective" of Mother. Mindy worried, "I don't feel like he's going to be, like, truthful with his words because he's going to feel like he's not on [Mother's] side."

[11]The CASA report dated August 11, 2022, stated that the CASA volunteer had observed a visit on August 2, 2022, and noted that she did not see anything to indicate a genuine connection between Mindy and Mother. The report further noted that the relationship that Mindy and her foster mom have is a positive and nurturing one.

Peter, who was six years old at the time of the trial, lacked sufficient maturity to express an opinion regarding a parental preference and did not testify at trial.

This factor weighs in favor of termination as to Mother's parental rights to Mindy and is neutral as to the termination of Mother's parental rights to Kyle and Peter.

### 2. The Children's Emotional and Physical Needs and the Parental Abilities of the Individuals Seeking Custody

The evidence showed that each of the children had some struggles and special needs that place a premium on parental abilities. Kyle had been moved several times during the case and had spent some time at Perimeter Hospital after he had attempted to harm himself. A status report and the permanency reports[12] reflected that Kyle had been diagnosed with, among other things, major depressive disorder, "other trauma-and-stressor-related disorder," borderline intellectual functioning, learning differences in reading and writing, and significant trust issues and was on medications for depression and agitation. The permanency specialist said that Kyle had "a long therapeutic future" ahead and was seeing two separate therapists and a psychiatrist. Kyle was two or three years behind in school and was reading at the level of a kindergartener or a first grader even though he was fifteen years old.

Mindy was also behind in school and was seeing a trauma therapist because she was going through a lot of emotional, mental, and behavioral trauma. The

---

[12]At the outset of the trial, the trial court took judicial notice of the entire clerk's record.

permanency reports to the court showed that Mindy had been diagnosed with, among other things, disruptive mood dysregulation, adjustment disorder with anxious mood, and "other specified trauma-and-stressor-related disorder" and that she was on medication for depression, anxiety, and allergies.

As to Peter, the permanency reports to the court showed that Peter had been diagnosed with adjustment disorder with disturbance of conduct and developmental disorder of motor function with a focus on speech and language. He was on medication for allergies and congestion and was seeing a play therapist and an occupational therapist.

Emily testified that she was concerned that the children would not have food if they were returned to Mother, and Emily's therapist did not believe that Mother was able to meet the physical and emotional needs of the children.

The Department did not express any concerns about the parenting abilities of the children's current foster parents. In contrast, the Department had many concerns about returning the children to Mother. Although Mother had completed the services on her plan, she had not accepted responsibility for any of the reasons for the children's removal or the outcries that had been made since the removal, she had not demonstrated the behaviors that she had learned in her parenting courses, and she had failed to make substantive changes in her life. Emily's therapist discussed how Mother had ceded her parenting duties to Emily, requiring her to not just babysit but to rear the children. The therapist opined, based on her knowledge of how long it

takes to unlearn a behavior and learn a new behavior, that Mother did not have enough tools yet (because it "takes years to develop the tools needed to create a healthy environment") to face "this lifetime of trauma that these kids are going through."

The May 18, 2022 permanency report described Mother's parenting skills at the visits as follows:

> [Mother] has demonstrated [that] she can recognize her kids['] physical needs and address with favorite foods, clothing, and toys that they like. However, she still struggles with emotional outbursts, talking about the case in front of her kids, and then showing anger towards caregivers of the children, while [the] children are present. She does not recognize that her behavior can be construed as manipulative and hurtful for the children. She has been [advised] numerous times [to] focus[] on the positives happening in her kids['] lives and [to] engag[e] them about school, extracurricular activities, and seasonal events. She continues to focus on any negative that presents and then blows up in front of the children causing a stress[ful] visit, triggering her sons to struggle following the visit.

These factors weigh in favor of termination.

### 3. The Emotional and Physical Danger to the Children

The permanency specialist believed that the events before the children's removal tended to show that Mother was neglectful and abusive and had allowed sexual abuse to continue as she did not prevent it. The evidence—that Mother had not stood up to Victor or her other paramours who had physically abused the children—caused the Department, Emily's therapist, the permanency specialist, and Emily to have concerns about Mother's willingness and ability to be protective of her children going forward. Mother, however, claimed that she had learned how to

15

protect her children. Emily's therapist also had concerns about Mother's unwillingness to "hear both sides" because of Mother's denial of the sexual-assault allegations and because Emily had mentioned that Mother had written Mindy and her a letter telling them that she had forgiven them for making up lies about what was going on in the home. Additionally, Mother had continued to cause emotional damage to Kyle by stating at the visits in front of him that she only wanted Peter back; this was devastating to Kyle.[13]

Emily opined that it would not be wise for Mother to have access to Kyle or to Mindy. When asked why she was concerned about the children being returned to Mother, Emily said, "I'm scared they will get treated as I did. I'm scared for their lives." Mindy similarly expressed concern about Kyle's safety if he were returned to Mother's care.

The evidence showed that Mother posed an emotional and physical danger to the children. This factor weighs in favor of termination.

---

[13]The May 18, 2022 permanency report described the emotional danger that Mother posed to the children as follows:

> [Mother had] been asked to not tell the boys about stressors that she is struggling with as [Kyle] personalizes them as "his fault[,]" and it is a trigger for him after the visit. [Mother] ha[d] been warned at every visit to follow the visitation guidelines but is not always compl[ia]nt with them. The girls have chosen not to attend weekly visits with [Mother] based on her dynamic with the children during the visits. [Mother] would make statements like, "I don't have to get the big kids back, just give me back [Peter]. If you girls would learn to keep your mouth shut, we wouldn't be here."

### 4. Plans for the Children and Stability of the Home or Proposed Placement

Mother planned to provide the children with a safe home in which there is no domestic violence and no drugs and said that she did not intend to "have another spouse." But Mother admitted that she did not have a lease and that her landlord could kick her out any day. Emily's therapist and the children's permanency specialist did not believe that Mother had demonstrated an ability to provide the children with a safe and stable environment. After the children's removal, Mother had moved to Dallas and then to Houston. Mother moved residences in Houston shortly before trial and refused to provide the permanency specialist with her new address until the week of trial. The courtesy worker in Houston was not able to view Mother's new home before the trial started.

The children's permanency specialist opined that it was in the children's best interest for the Department to be named as permanent managing conservator with the right to place the children for adoption. Kyle and Peter lived in one foster home, while Emily and Mindy lived in another foster home, and both homes were adoption motivated. The permanency specialist said that both foster homes are safe and stable.

These factors weigh in favor of termination.

### 5. Mother's Acts or Omissions Indicating an Improper Parent-Child Relationship and Her Excuses

Mother's acts and omissions indicating an improper parent–child relationship are detailed above. As for excuses, Emily's therapist did not believe that Mother had

taken responsibility for the abuse and neglect that was perpetrated on the children in the home, as demonstrated by Mother's stating that her children were liars and that they had mental health problems and by her blaming Victor for all her problems.[14]

During Mother's testimony, she admitted that she had made bad choices in men (including with the children's fathers) and said that she had accepted her mistake of staying with a person like Victor; she said that she would not make the same mistake again. Besides being in a relationship with Victor, Mother said that her only

---

[14]During her testimony, Mother blamed Victor for everything that had happened:

> Q. Are you telling the Court that you were a perfect mother until Victor . . . came into your life?
>
> A. Yes.
>
> Q. So it's Victor . . . that spoiled this whole thing?
>
> A. Unfortunately, yes. He's the one that ruined my whole life and with my children.
>
> Q. How did he ruin your life?
>
> A. He ruined it by what he got himself into. And he would scold my children a lot, and I didn't like that and that's why we would have a lot of arguments.

Mother's position was that she was the victim in all this because no one with the Department would listen to her.

other mistake was working so much that she could not keep an eye on her children.[15] As for other excuses, Mother said that her children had lied about her prostituting herself and about her having multiple partners who had perpetrated domestic violence on her;[16] that she had never seen Victor cutting or packaging cocaine at the table and had never instructed the children to clean the table afterwards; that she had never hit her children but had only talked to them;[17] that she never knew that Kyle was delivering cocaine for Victor; that Emily had lied when she said that Mother had blackmailed "the Chicken Man" and that the man had "only touched" Emily; that she never knew that Aaron had sexually assaulted three of his siblings; that she had never beat her children or cleaned the floor with their faces; that she had never said in front of Kyle that she only wanted Peter back; that Victor, not she, had been the one who had put Kyle to work; and that she had never had any miscarriages or disposed of any babies' remains in the trash or put them in the freezer. Despite Mother's numerous denials, a factfinder is not compelled to believe testimony that comes from a biased or an interested source. *See In re M.S.*, No. 02-21-00007-CV, 2021 WL 2654143, at *16 (Tex. App.—Fort Worth June 28, 2021, pet. denied) (mem. op. on reh'g).

---

[15]Mother testified that she had worked from 1:00 to 9:30 p.m. at a bakery and that her older children watched her younger children. At the time of the trial, Mother was employed at a paint company.

[16]She claimed that Victor was the only one who had assaulted her and that it had happened many times.

[17]Though later she admitted that she had spanked them or swatted them on their hands.

Even if Mother's admissions are equal to her excuses, creating a neutral factor, the acts-and-omissions factor weighs in favor of termination.

### 6. Holding

Based on all the evidence and applying the appropriate standards of review, we hold that the evidence is legally and factually sufficient to support the trial court's finding that termination of Mother's parental rights to Kyle, Mindy, and Peter was in the children's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *Jordan v. Dossey*, 325 S.W.3d 700, 733 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (holding evidence legally and factually sufficient to support the trial court's best-interest finding when most of the best-interest factors weighed in favor of termination). Accordingly, we overrule Mother's argument challenging the sufficiency of the evidence to support the trial court's best-interest finding.

## VI. Conclusion

Having overruled both of the arguments that Mother raises in her brief, we affirm the trial court's order terminating Mother's parental rights to Kyle, Mindy, and Peter.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered: March 9, 2023

20